TOWN OF ANDOVER *VS.* ANDOVER POLICE PATROLMEN'S
UNION.

No. 96-P-0190.

Suffolk. June 5, 1997. - July 3, 1998.

Present: ARMSTRONG, BROWN, & GREENBERG, JJ.

*Police,* Assignment of duties, Authority of police chief, Collective bargaining,
Compensation. *Labor,* Collective bargaining, Public employment, Arbitra-
tion. *Contract,* Collective bargaining contract. *Arbitration,* Police, Collec-
tive bargaining, Confirmation of award.

Where G. L. c. 41, § 97A, rested exclusive managerial authority in chiefs of
police and where that statutory provision was not enumerated in G. L.
c. 150E, § 7(*d*), so as to be superseded by the provisions of a collective
bargaining agreement, grievances based on a police chief's assignment of
mandatory overtime patrols were not arbitrable. [169-170]

CIVIL ACTION commenced in the Superior Court Department on
February 2, 1995.

The case was heard by *Margot Botsford,* J.

*Michael C. Gilman* for the plaintiff.

*Shailah T. Stewart* for the defendant.

ARMSTRONG, J. This matter comes before us on the appeal of
the town from a decision confirming an arbitrator's award in
favor of the union on two grievances. The first concerned an
order by the chief of police that officers work the 1993 and
1994 Independence Day celebrations as overtime assignments.
The second was an order by the chief that officers work an Air
Force Band concert at the local high school auditorium as an
overtime assignment. The concert was a sell-out, and the spon-
sors decided to extend the concert to a second night. The police
assignments for the second night were treated as a paid detail
rather than as overtime assignments, enabling officers the second

night to receive higher compensation than officers had received in overtime for the first night.[1]

The arbitrator decided that the Independence Day assignments should be treated as a paid detail, reasoning that, although those assignments had for many years been paid as regular overtime, in 1993 and 1994, the celebrations, which had previously been funded by town-wide public donations, were primarily funded by the sponsorship of Marshall's, a large retail store which promoted itself as sponsor, and thus the assignments took on something of the character of private project details for the benefit of corporate or business sponsors. The arbitrator applied the same private-benefit analysis to the band concert, which was promoted jointly by the Lawrence Eagle-Tribune and an Andover patriotic civic group; the fact that the town donated the use of the auditorium and the police coverage the first night[2] was its own concern, but on the first night, the arbitrator reasoned, the police officers should not have been made to work overtime (or at overtime rates of pay) partly for the promotion of a private business.[3] There was certainly no justification, the arbitrator thought, for differentiating the compensation of officers between the first and second nights.

The town argued below, as it does here, that the award should be vacated as infringing on the exclusive managerial prerogative of the police chief over the deployment of police officers on an overtime basis when, in his judgment, the public safety so requires, relying on such decisions as *Chief of Police of Dracut* v. *Dracut*, 357 Mass. 492, 502 (1970); *Boston* v. *Boston Police Patrolmen's Assn.*, 403 Mass. 680, 684-685 (1989); *Boston* v.

---

[1]Paid detail, which was voluntary, paid $35 per hour with a minimum compensation of four hours per assignment. On holidays, such as Independence Day, details were compensated at two and one-half times the regular paid detail rate. Overtime, by contrast, was paid at one and one-half times normal hourly compensation. Overtime was involuntary, in the sense that the department mandated that officers work the designated extra hours of duty; but officers were first asked to volunteer for the mandated hours before assignments were made on an involuntary basis.

[2]The town charged the sponsors $1,750 for the use of the auditorium the second night, and, as mentioned in the text, the sponsors paid for the police coverage the second night at the paid detail rate.

[3]"It makes sense that if a private group is to receive direct or indirect benefit from an event, there is little justification for the Town to subsidize the enterprise, and for the police to work at a lesser rate. . . . There is also no justification for compelling officers to work, in the event there are insufficient volunteers."

*Boston Police Patrolmen's Assn.*, 8 Mass. App. Ct. 220, 226-227 (1979); *Boston* v. *Boston Police Superior Officers Fedn.*, 9 Mass. App. Ct. 898 (1980); and *Taunton* v. *Taunton Branch of the Mass. Police Assn.*, 10 Mass. App. Ct. 237, 243 (1980). Contrast *Boston* v. *Boston Police Superior Officers Fedn.*, 29 Mass. App. Ct. 907, 908-909 (1990). The judge disagreed, reasoning that, despite the wording of the grievances as submitted to the arbitrator,[4] the arbitrator was in effect called to rule, not on the chief's power to order his officers to work the overtime assignments, but rather on the rates of compensation that would be paid for the assignments — a mandatory subject of collective bargaining. See G. L. c. 150E, § 6.

The judge's thoughtful memorandum of decision was written before the decision of this court in *Boston* v. *Boston Police Patrolmen's Assn.*, 41 Mass. App. Ct. 269 (1996), in which on indistinguishable facts this court vacated an arbitrator's award requiring that a walking patrol of officers in the East Fenway area of Boston, previously sponsored by Northeastern University at voluntary paid detail rates, but changed in 1992 to a mandatory overtime patrol, be compensated at paid detail rates. There we rejected the contention that the question of compensation could be meaningfully distinguished from the question of the police commissioner's authority to mandate patrols when, in his judgment, concerns of public safety so required. On the authority of that case, a judgment is required vacating the arbitrator's award.

The only basis suggested for distinguishing the 1996 *Boston Police Patrolmen's Assn.* decision is that it rested on a special act, St. 1906, c. 291, § 11, as amended by St. 1962, c. 322, § 1, that established the exclusive authority of Boston's police commissioner to manage the administration and direct the disposition of the members of the Boston force. That statute, as pointed out in the *Boston Police Patrolmen's Assn.* decision, was not one of those listed in G. L. c. 150E, § 7(*d*), as yielding to a collective bargaining agreement in the event of conflict. Other

---

[4]"Did the Town violate Article 12 of the 1989-1992 agreement *when it assigned police officers* to work on July 5, 1993 and July 4, 1994 on an overtime basis rather than treating the work as a paid detail?" (Emphasis supplied.)

"Did the Town violate Article 12 of the 1989-1992 agreement *when it assigned police officers* to work on an overtime basis on February 19, 1994 at a band concert held at the Collins Center rather than treating the work as a paid detail?" (Emphasis supplied.)

statutes, however, such as G. L. c. 41, §§ 97 and 97A, vest similar managerial authority in chiefs of police generally[5]; and, while G. L. c. 150E, § 7(d), states that a collective bargaining agreement will prevail over municipal regulations generally, and over the regulations of a police chief issued under G. L. c. 41, § 97A, in particular, nothing in § 7(d) purports to displace the general authority vested in a police chief by § 97A to order his officers to a mandatory overtime deployment when, in his judgment, the public safety so requires. See generally *Taunton* v. *Taunton Branch of the Mass. Police Assn.*, 10 Mass. App. Ct. at 242-245.[6] Compare *Boston* v. *Boston Police Patrolmen's Assn.*, 403 Mass. at 684.[7]

The judgment is reversed, and a new judgment is to be entered vacating the portions of the arbitration award relating to the Independence Day celebration and to the Air Force Band concert.

*So ordered.*

---

[5]See G. L. c. 41, § 97 ("The chief of police shall be in immediate control of all town property used by the department, and of the police officers, who shall obey his orders"); G. L. c. 41, § 97A, as amended by St. 1948, c. 595 ("The chief of police in any such town shall be in immediate control of all town property used by the department, and of the police officers, whom he shall assign to their respective duties and who shall obey his orders").

[6]Until compulsory arbitration of police labor disputes was abolished by Proposition 2½, see St. 1980, c. 580, § 10, repealing St. 1973, c. 1078, § 4, the latter section (as appearing in St. 1977, c. 347, § 2) precluded from such arbitration "the following matters of inherent managerial policy: the right to appoint, promote, assign and transfer employees . . . ." As to the effect of Proposition 2½ on final and binding arbitration in labor impasses including police and firefighters, see *Massachusetts Teachers Assn.* v. *Secretary of the Commonwealth*, 384 Mass. 209, 236-238 (1981).

[7]Even in the absence of explicit statutory authority conferring the power of assignment, the widely cited decision by Justice Quirico in *Chief of Police of Dracut* v. *Dracut, supra*, although overruled in part by statute, see *Labor Relations Commn.* v. *Natick*, 369 Mass. 431, 437-438 & n.4 (1976), seems to stand as authority for the proposition that, absent express statutory provision to the contrary, the power of assignment inheres by implication in the relationship of a police chief to the officers serving under his command. See *Boston* v. *Boston Police Patrolmen's Assn.*, 403 Mass. at 684; *Taunton* v. *Taunton Branch of the Mass. Police Assn.*, 10 Mass. App. Ct. at 243-244.