Garsh, J.
Plaintiff, Corcoran, Mullins & Jennison, Inc., General Partner of Bayside Associates Limited Partnership (“Bayside”), commenced this breach of contract and declaratory judgment action against defendants, Edward M. Flanagan and Rocco E. Paoletta dba North American Expositions Co. (“North American”) asserting that the contract executed by the parties requires North American to pay for the Boston Police Department’s details at events conducted by North American and held at the Bayside Exposition Center. Specifically, Bayside alleges that North American breached the contract by refusing to reimburse it for paid police details imposed by the Boston Police Department, and it seeks a declaration that North American is responsible for the amounts charged by the Boston Police Department for these details. The parties have cross-moved for partial summary judgment on both counts of the complaint solely on the issue of whether the Boston Police Department has the authority to impose paid details upon the parties. North American seeks a declaration that the Boston Police Department lacks the authority to require paid details,[4] while Bayside seeks a declaration that the Boston Police Department does possess this authority. After the hearing on the cross-motions, the court entered an interim order requiring Bayside to notify the Boston Police Department of this action and permitting the Boston Police Department the opportunity to intervene or to file an amicus brief addressing the issue of its purported authority. The Boston Police Department declined to file an amicus brief or to become a party.
BACKGROUND
The following facts are not disputed:
Bayside owns and leases out exhibition space at the Bayside Exposition Center (“Bayside Expo Center”). In connection with the Bayside Expo Center, Bayside has an alcoholic beverages license issued by the Licensing Board for the City of Boston (“Licensing Board”) and an entertainment license issued by the Licensing Division of the Mayor’s Office of Consumer Affairs (“Licensing Division”). Entertainment licenses are signed by the Mayor.
On July 14, 1982, Bayside and North American executed the License Agreement for Bayside Exposition Center (“Agreement”) which permitted North American to produce and operate shows at the Bayside Expo Center to which the public is invited, such as the New England Camping and Recreational Vehicle Show, the North American Home Show, and the New England Boat Show. Under the Agreement, Bayside agreed to provide North American the use of Bayside Expo Center’s facilities and its liquor and entertainment licenses in exchange for a rental fee paid by North American. The Agreement was for a period of ten years. Subsequently, the parties amended the Agreement to permit North American the option of renewing the Agreement for an additional ten years.
In addition to providing the facility and use of its alcohol and entertainment licenses, Bayside agreed, in paragraph 4 of the Agreement, to furnish, without cost to North American, the following services during the operation of a show: heat, air conditioning, overhead lighting, public address systems, restroom facilities and janitorial services. Paragraph 6 of the Agreement provides that North American is responsible for the expense of all other services, equipment, and personnel not provided for under paragraph 4. This includes, but is not limited to, “(p)ersonnel as may be required to stage an event, including without limitation, ushers, ticket sellers, ticket takers, box office personnel, stagehands, sound operators, guards and musicians.” Paragraph 6 further provides that “(a]s soon as [Bayside] has determined the additional charges called for under this paragraph, it will notify [North American] and [North American] will, if requested by [Bayside], deposit the total amount of such charges, by certified check, within 72 hours of delivery of notice.” The parties also agreed, in paragraph 19, that “duly authorized representatives of [Bayside], [the] City and [the] Commonwealth may enter the *310 premises ... at any time and on any occasion without any restrictions whatsoever.”
For several years, the parties operated without incident concerning the expense of a police detail. North American would request and pay for a one or two person police detail at its shows. In 1996, Captain Joseph Dunford, District Commander of the Boston Police Department, informed the parties that the Boston Police Department had the power and authority to require them to pay for police details for public shows conducted at the Bayside Expo Center. Specifically, Captain Dunford advised the parties they would have to hire police details for North American’s three shows, the New England Camping and Recreational Vehicle Show, the North American Home Show, and the New England Boat Show. North American objected, asserting that the Boston Police Department lacked the authority to impose paid details. North American also informed Bayside that it was unwilling to pay for police details imposed by the Boston Police Department.
On January 6, 1997, North American requested the Boston Police Department to provide a police detail for three upcoming shows, each of which was to run for nine days. North American asked for two officers to be present on the weekend and one officer on the weekdays. It was willing to pay for the officers it requested to be present. On January 8, 1997, Sergeant John Kelly of the Boston Police Department responded to North American’s request with an adjusted detail schedule purportedly based on the “public safely concerns of the Boston Police Department.” The adjusted schedule required three officers and a supervisor to be present on the weekend and two officers during weekdays. On January 10, 1997, North American advised the Boston Police Department that it was unwilling to accept any staffing for paid details in excess of the number it had requested and informed Sergeant Kelly that, if the Boston Police Department would not accept its original request, North American would not hire any police officers at all and would instead look elsewhere to satisfy its security needs.
North American took the position that it was not required by any statute or lawful regulation to provide and pay for police details at its shows. The Boston Police Department took the position that it had the power to require the parties to pay for police details if it determined there was a need for a detail even if the parties made no request for a detail and communicated that no detail was wanted. The Boston Police Department sent officers to North American’s shows. North American refused to pay for more persons than it had sought in the request that had been withdrawn.
Bayside paid the Boston Police Department for the additional paid details imposed upon North American’s three 1997 shows and demanded that North American reimburse it for this expense. North American did not do so. North American requested no police details in 1998. Nevertheless, officers were present at its three 1998 shows, and the Boston Police Department sought payment for their services. Bays-ide again paid the Boston Police Department and looked to North American to reimburse it. North American did not reimburse Bayside. Bayside paid the Boston Police Department in order not to interfere with the conduct of the shows and out of fear that failure to do so would jeopardize its licenses.
DISCUSSION
Summary judgment as to the authority of the Boston Police Department to impose paid details is appropriate because there are no genuine issues as to any material fact bearing on that dispute. Cassesso v. Commissioner of Correction, 390 Mass 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass 550, 553 (1976); Mass.R.Civ.P. 56(c). Under the Agreement, North American agreed to pay for “personnel as may be required to stage an event including without limitation . . . guards ...” Bayside asserts that the Boston Police Department has the authority to impose paid police details upon the parties for events staged at the Bayside Expo Center. Thus, according to Bays-ide, once the Boston Police Department requires that there be a certain number of officers at an event, that determination constitutes the requisite amount of security personnel required under the Agreement and North American is obliged to pay this expense. Conversely, North American argues that the Boston Police Department does not possess the authority to compel paid details and that the amount of security required under the Agreement to stage an event is a question of fact.
Bayside relies on a variety of sources for the proposition that the Boston Police Department may impose paid details upon private entities for events or shows such as those held at the Bayside Expo Center.[5] No statute, ordinance, or regulation grants express authority.
Interpretation of a regulation or a statute is a question of law for the court. Corsetti v. Stone, 396 Mass. 1, 12 (1985); Casey v. Massachusetts Electric Co., 392 Mass. 876, 879 (1984). A court will interpret a statute “according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.” Champagne v. Champagne, 429 Mass. 324, 326 (1999). The language of a statute is the principal source of insight into the legislative purpose, and a court need not look beyond the words of a statute where the language is unambiguous. Leary v. Contributory Retirement Appeal Board, 421 Mass. 344, 345 (1995). A regulation is interpreted according to traditional rules of statutory construction in the same manner as a statute. See Massachusetts Municipal Wholesale Electric Co. v. Massachusetts En *311 ergy Facilities Siting Council, 411 Mass. 183, 191 (1991). Not one of the purported sources of authority, each of which will be discussed in turn, is a foundation upon which authority to require paid details upon Bayside and North American can be predicated.
St. 1906, c. 291, §11 as amended by St. 1962, c. 322 and G.L.c. 41, §98
The Legislature has granted the Boston Police Department general law enforcement power through the enactment of St. 1906, c. 291, as amended by St. 1962, c. 322, and G.L.c. 41, §98. Specifically, under St. 1962, c. 322, which created the position of the Boston Police Commissioner, the Legislature stated in §11 that “(t]he police commissioner shall have cognizance and control of the government, administration, disposition and discipline of the department, and of the police force of the department, and shall make all needful rules and regulations for the efficiency of said police . ..” This is a “broad” grant of authority. Boston v. Boston Police Partolmen’s Ass’n, Inc., 403 Mass. 680, 684 (1989). Pursuant to that grant, the police commissioner has exclusive authority to deploy police officers to cover particular situations in order to meet the demands of public safely. Boston v. Boston Police Patrolmen’s Ass’n, Inc., 41 Mass.App.Ct. 269, 272 (1996); See also Andover v. Andover Police Patrolmen’s Union, 45 Mass.App.Ct. 167, 169, rev. denied, 428 Mass. 1105 (1998) (c. 322, §11 established the exclusive authority of Boston’s police commissioner to direct the disposition of members of the Boston force).
The Boston Police Department also acts pursuant to G.L.c. 41, §98, which expressly directs that the police “shall suppress and prevent all disturbances and disorder.” Under the plain language of §98, it is reasonable to expect that, in order to prevent disturbances and disorder, the police have the discretion, in the interest of public safety and the safety of police officers, to assign a certain number of police officers to patrol certain events at any given time. Cf. Chief of Police of Dracut v. Dracut, 357 Mass. 492, 502 (1970) (a collective bargaining agreement which impinges upon the power and authority of police chief to assign officers to duties is null and void).
Accordingly, acting under its general law enforcement power, the Boston Police Department may assign police officers to particular duties that concern public safety. Should a private entity produce and operate an event open to the public, such as those held at the Bayside Expo Center, the police have the authoriiy to require that a certain number of police officers be present in order to protect the interests of public safety. In other words, the Boston Police Department had the power to compel North American and Bayside to have police officers present for the duration of the three shows in a number determined by the Boston Police Department in its sole discretion. It does not follow, however, that the Commissioner, in the absence of any lawfully issued regulation, has the power to require private parties to pay for the officers’ presence.
City of Boston Ordinances, §17-13.3
Section 17-13.3 of the City of Boston Ordinances permits the Mayor, when issuing an entertainment license, to impose conditions upon such license relating to “public safety, health or order, or to steps required to be taken to guard against creation of a nuisance or to insure adequate safety and security for patrons of the affected public.” This ordinance may grant the Mayor the power to require a licensee to pay for a police detail consisting of the number of officers deemed necessaiy by the Boston Police Department to meet public safety concerns as a condition of the issuance of an entertainment license. It does not grant the Boston Police Department the power to impose paid police details independent of conditions upon a license, and there is no rule, regulation or official act delegating the Mayor’s authority to the police.
Furthermore, the ordinance has no effect upon Bayside’s entertainment license because no conditions were imposed upon that license which require a police detail. Whether the Mayor could have required Bayside, as a condition to obtaining its entertainment licensee, to agree to pay for a police detail at shows held at the Bayside Expo Center is irrelevant because the Mayor did not.
Presumably, the City has the authority to enact an ordinance which would require a licensee to have a police presence at any show or event open to the public and to exact a fee for this service. See Taunton Greyhound Ass’n, Inc. v. Dighton, 373 Mass. 60, 62 (1977) (by-law requiring operator of dog racing track to request chief of police to assign officers on each racing night and to compensate the officers at the prevailing extra duty rate does not deprive operator of property without due process of law). Indeed, this kind of ordinance or by-law is commonplace. Id. The object of such an ordinance “lies in the heartland of acknowledged purposes” of G.L.c. 40, §21(1), which permits cities and towns to enact ordinances for “preserving peace and good order.” Id. at 62-63.
Here, the City enacted Chapter XI, §ll-6.9(e), a by-law authorizing the Public Works Commissioner to require any person receiving a permit for street work to hire and pay for at least one Boston police officer or as many Boston police officers as the Police Commissioner determines are necessary to be present while the street work is being carried out.[6] The City did not, however choose to pass an ordinance permitting the Boston Police Department to charge a fee for a police detail upon persons staging or holding an event open to the public. “[Enactions of this kind, however just and reasonable, are in the nature of an involuntary payment imposed upon the citizen. The intent to impose such a burden should be clearly expressed by the legislative department [city’s common council], which alone has power to impose it; and such intent *312 should not first be discovered by a process of judicial construction.” Hartford v. Parsons, 87 A. 736, 737 (Conn. 1913) (in the absence of any contractual obligation, cost of police officers required to be present must rest on city until city council enacts an express ordinance imposing this expense upon a private citizen).
At this time, the City has not elected to impose a fee upon a private citizen for a police detail determined by the Police Department to be necessary for a show or event open to the public. Whether the cost of providing police services should be assessed to the party creating the need for such services is beyond the purview of this court because “(j)udges may not legislate simply because [an ordinance] lacks provision for a particular event or contingency.” Simmons v. Yurchak, 28 Mass.App.Ct. 371, 376-77 (1990). See also Pielech v. Massasoit Greyhound, Inc., 423 Mass. 534, 539 (1996) (court’s authority to interpret and apply statutes is limited by its constitutional role as a judicial, rather than a legislative, body). Thus, the Boston Police Department does not have authority under a City ordinance to require Bayside or North American to pay for the presence of police officers at events held at the Bayside Expo Center if the presence of the police is not the result of a contractual arrangement freely entered into -with the Boston Police Department.[7]
Rules and Regulations of the Licensing Board for the City of Boston
As a holder of an all alcoholic beverages license, Bayside is subject to the following rules and regulations promulgated by the Licensing Board:
Section 1.09(a) authorizes the Boston Police Department and other duly authorized agents of the Licensing Board to inspect all licensed premises;[8]
Sections 1.05(a) and 1.05(e) require the licensed premises to comply with all applicable building codes, fire, health, safety, trash laws and all other statutes and regulations and to keep the premises sufficiently lighted for the safety of patrons and agents of the Licensing Board conducting inspections.[9]
Sections 1.08(a), 1.08(b), and 1.08(c) require the licensee to carefully supervise the licensed premises at all times, comply with all applicable health and safety laws, and act reasonably and diligently to disperse loiterers or patrons who congregate at the licensed premises, and Section 1.08(e) holds the licensee accountable for any noise or disturbance which adversely affects the health, welfare and safety of residents in the area or results in the premises becoming a focal point for police attention;[10]
Sections 1.12(a) and 1.12(b) prohibit illegal activity on the licensed premises and require the licensee to take reasonable steps to prevent illegal activity at the licensed premises including, inter alia, calling for police assistance as necessary and hiring security personnel;[11] and
Section 1.14(a) authorizes the modification, suspension or revocation of a license due to a violation by the licensee of any relevant statute, ordinance or regulation or for failing to comply with any condition, stipulation or agreement upon which the license was issued.[12]
These regulations clearly give the Boston Police Department the authority to enter and inspect the licensed premises. No regulation, however, permits the Boston Police Department to charge a fee to a licensee for an involuntary police detail.[13] In fact, §1.08 of the Licensing Board’s regulation lists specific steps a licensee may take to comply with its obligation to ensure a high degree of supervision over the licensed premises at all times. Those steps include hiring a security guard or stationing a security employee at the front door of the premises. Such permission negates any inference that hiring a police detail is required for a licensee to fulfill its obligation to supervise the premises. Licensing Board Regulations, §1.08(c)(4). Clearly, a “security guard” is not a police officer. Additionally, §1.12 requires the licensee to make reasonable and diligent efforts to prevent illegal activities from occurring on the premises. Section 1.12 also makes specific suggestions as to ways in which a licensee may take reasonable steps to prevent illegal activity on the premises. These steps include calling for police assistance as necessary to protect patrons against injury or to evict unruly patrons or hiring security personnel to deal with unlawful activity at the premises. Licensing Board Regulations, §§1.12(a)(5)(6). Hiring a police detail is one means a licensee can satisfy its duty to take reasonable steps to prevent illegal activity from occurring on its premises, but use of that method is not mandated by the Licensing Board.
The plain and unambiguous language of the regulations relied upon by Bayside make clear that the Licensing Board did not require its licensees to pay for unwanted police details nor grant the Boston Police Department the power to impose paid details upon a licensee. See Southview Co-operative Housing Corp. v. Rent Control Board of Cambridge, 396 Mass. 395, 399 (1985) (principal indication of intent is the language of the statute.) This court will not add to the regulations a word or provision that the Licensing Board chose not to include. See Dartt v. Browning-Ferris Industries, Inc. (Mass.), 427 Mass. 1, 9 (1998).
Rules and Regulations of the Licensing Division
As a holder of an entertainment license, Bayside also is subject to regulations promulgated by the Licensing Division. Section A(4) of those regulations provides that “[t]he Licensee shall allow any person designated by the Mayor including the Boston Police to enter, to inspect, to view any exhibition or show, and to participate in any Amusement.” Boston Police Department officers accordingly may enter Bayside and remain on-site for the duration of any show produced by North American. By contrast, there is no *313 reference to the Boston Police in §A(5), which provides that “[t]he licensee shall hire at his own expense a police and fire detail as the Mayor shall require.” This provision authorizes the Mayor, not the Boston Police Department, to require a licensee to hire a police detail.
The fact that the Licensing Division elected to give the power to impose paid police details solely to the Mayor cannot be ignored. Where a statute or regulation is detailed and precise, an omission will be regarded as purposeful. Leary v. Contributory Retirement Appeal Board, 421 Mass. 344, 348 (1995). As a general rule, “where the [agency] has employed specific language in one paragraph, but not in another, the language should not be implied where it is not present.” Boston Neighborhood Taxi Ass’n v. Department of Public Utilities, 410 Mass. 686, 689 (1991), quoting Massachusetts Medical Society v. Commissioner of Insurance, 402 Mass. 44, 63 (1988). Where the Licensing Board chose to permit any person designated by the Mayor, including the Boston Police Department, to inspect, while, at the same time, it chose to direct a licensee to hire a police and fire detail as the Mayor shall require, this court will not interpret §A(5) as implying that both the Mayor and the Boston Police Department were granted the power to impose paid police details. The plain and unambiguous language indicates otherwise, and the Licensing Division’s omission in §A(5) will be regarded as purposeful.
Bayside, however, argues that the Boston Police Department is the authorized agent of the Mayor and thus the Boston Police Department can impose paid details upon licensees pursuant to §A(5) under the Mayor’s authority. In support of its argument, Bayside cites to §5 of the Regulatory Standards and Procedures for Granting, Conditioning, Denying, Suspending or Revoking Entertainment Licenses promulgated by the Licensing Division. That section provides:
Boston Police Officers are authorized as agents of the Mayor’s Office of Consumer Affairs and Licensing to inspect places of public entertainment licensed or required to be licensed by said office. Such officers may report to the Mayor such information as may be relevant to the standards and procedures outlined in this regulation.
The language in §5 undercuts, rather than supports, Bayside’s position as it states that the Boston Police Department is authorized as an agent of the Mayor for the purpose of inspecting licensed premises. After inspection, the police may report to the Mayor. Section 5 contains no general delegation to act as agent of the Mayor and does not expressly or by implication authorize the Boston Police Department to act as agent of the Mayor in connection with §A(5) of tb 3 Licensing Division regulations.
Simply put, the Licensing Division regulations taken together demonstrate that the power to require a licensee to hire a police detail rests solely with the Mayor and that the Boston Police Department is only authorized to act for the Mayor when conducting inspections at licensed premises. Accordingly, the Licensing Division regulations do not provide authority to the Boston Police Department to impose paid police details upon Bayside or North American.
Internal Rules of the Boston Police Department
Bayside argues that internal rules and regulations promulgated by the police commissioner authorize the Boston Police Department to compel citizens to hire police details. As discussed above, under the legislative grant of authority under St. 1906, c. 291, §11 as amended by St. 1962, c. 322, the police commissioner has the power “to make all needful rules and regulations for the efficiency of said police.” The police commissioner has broad discretion in formulating such rules. See Boston v. Boston Police Patrolmen’s Ass’n, Inc., 8 Mass.App.Ct. 220, 226 (1979). The police commissioner has promulgated several rules concerning paid police details and a special order establishing guidelines and procedures which a district commander should follow when evaluating the need for a paid detail.
This court need not address the substance of these rules and special order or decide whether the power to make rules for the “efficiency” of the police encompasses a power to promulgate regulations requiring private citizens to pay for police details because the rules and order at issue do not have any legal force and effect upon Bayside and North American.[14] The police commissioner did not promulgate these rules pursuant to G.L.c. 30A, and thus they are internal guidelines only. See Northbridge v. Natick, 394 Mass. 70, 76 (1985). The police commissioner clearly has “the power to set internal guidelines for carrying out [the Boston Police Department’s] duties “without going through the procedures required for promulgation of a regulation,’ . . . but such policy statements do not have the legal force of a statute or regulation.” Id. Since the guidelines are directed solely towards the conduct of police officers, they cannot serve as authority for the Boston Police Department to force private citizens to hire police details for public shows or events.
Conclusion
Boston Police officers have the power and authority to enter licensed premises such as the Bayside Expo Center when public shows or events are held with as many officers as the Boston Police Department deems necessary in order to ensure the public safety. At present, the cost of the officers whom the Police Department chooses to assign to shows at the Bayside Expo Center must rest with the City.[15]
ORDER
For the above reasons, the Court hereby ORDERS that the Defendants’ Motion for Partial Summary Judgment is ALLOWED and Plaintiffs Motion for Partial Summary Judgment is DENIED. The court de- *314 dares that the Boston Police Department did not possess the authority in 1997 and 1998 to require paid police details at events conducted by North American Expositions Co. and held at the Bayside Exposition Center and that the Boston Police Department currently does not possess authority to require such paid details.

 If the Boston Police Department lacks authority to require paid police details, material issues of fact remain bearing on North American’s liability under the contract to pay for services “required to stage an event.”

 For authority to impose paid police details, Captain Dunford and the Boston Police Department rely on the following: (a) Massachusetts statutes granting power to police departments; (b) City of Boston ordinances; (c) regulations of the Licensing Board; (d) regulations of the Licensing Division; (e) Rules 325 and 326 of the Rules and Procedures of the Boston Police Department and supplemental rules of the police department; and (f) Special Order No. 94-7 of the Boston Police Department.

 Specifically, Chapter XI, Public Services, § 11.6.9 provides in pertinent part;
The Commissioner may issue permits to persons having authority in the premises to open, occupy, obstruct and to use portions of the street. Such permits . . . shall be granted upon . . . the further conditions as follows:
(e) That the Commissioner shall require the person receiving the permit to maintain the expense of such person as many Boston Police Officers on special duty (outside their regular tour of duty), as the Police Commissioner may determine necessary to protect the safely and general welfare of the public and to preserve the free circulation of traffic (but in no event less than one (1) Boston Police Officer) ... It shall be the duly of the Public Works Commissioner to ascertain compliance of this section prior to issuance of the permit.

 The possibility that Bayside may have voluntarily entered into a contract with the Boston Police Department is a factual question that the parties do not address. To the extent that Bayside agreed to pay for security that was not “required to stage an event,” North American’s position is that it is not obligated, under the terms of its Agreement, to reimburse Bayside.

 Section 1.09(a) specifically provides: “All licensed premises shall be subject to inspection by the Police Department of the City of Boston and other duly authorized agents of the Licensing Board.”

 Section 1.05 provides in pertinent part:
a.No licenses shall issue or shall be considered in good standing unless licensed premises comply with all statutory requirements, including all applicable building codes, and fire, health, safety, trash, and other government regulations and law.
e. The premises shall be lighted in all public areas in an manner sufficient for the safety of the patrons and in manner sufficient for the agents of the Board to make observations at the premises without the need to identify themselves or the need to seek assistance.

 Section 1.08 provides in pertinent part:
a. It shall be obligation of licensees to ensure that a high degree of supervision is exercised over the conduct of the licensed establishment at all times. Each licensee will be held accountable for all violations that are related to the licensed premises to determine whether or not the licensee acted properly in the given circumstances.
b. Licensees shall maintain compliance with all health and safety laws for the areas outside and contiguous to the licensed premises.
c. Licensees shall act reasonably and diligently to disperse loiterers or patrons who attempt to congregate in front of or at the licensed premises. Failure of the licensee to keep persons from congregating at the licensed premises may lead to disciplinary action against the licensee for allowing a public nuisance. Reasonable steps to be taken by the licensee may include: (1) maintaining the front door in a closed position; (2) asking loiterers to disperse; (3) calling the police if loiterers refuse to disperse; (4) hiring a security guard or stationing a security employee at the front door to disperse loiterers; (5) refusing to allow the same patrons to walk in and out of the premises at short intervals; (6) maintaining order in lines of patrons waiting outside to get in; (7) announcing that no further patrons will be allowed into the premises if lines become too long or disorderly or loud.
e. When any noise, disturbance, misconduct, disorder, act or activity occurs in the licensed premises, or in the area in front of or adjacent to the licensed premises, or in any parking lot provided by the licensee for the use of its patrons, which in the judgment of the Board adversely affects the protection, health, welfare, safety or repose of the residents of the area in which the licensed premises are located, or results in the licensed premises becoming the focal point for police attention, or is offensive to public decency, the licensee may be held in violation of the license and subject to proceedings for suspension, revocation or modification of the license.

 Sections 1.12 provides in pertinent part:
(a) Licensees shall make all reasonable and diligent efforts to ensure that illegal activities do not occur at the licensed premises. Such efforts may include: ... (5) calling for police assistance as necessary to protect patrons against injury or to evict unruly patrons or to uncover unlawful conduct or to give medical assistance and providing police with requested information; (6) hiring security personnel to deal with chronic unlawful activity at the premises such as prostitution or gambling or larceny from patrons or assaults and batteries or other problems associated with the premises.
(b) There shall be no disorder, indecency, prostitution, illegal gambling, illegal drug use or sales or possession, or other illegal activity on the licensed premises or any premises connected therewith by an interior communication.

 Section 1.14 provides in pertinent part:
(a) Any license issued pursuant to General Laws Chapter 138 and Chapter 140 for the service of food or beverages to the public may be modified, suspended, or revoked for any of the following causes:
(1) Violation by the licensee of any provision of the relevant General Laws of the Commonwealth or the relevant Ordinances of the City of Boston or of any rule or regulation of any City of Boston agency or of the Alcoholic Beverages Control Commission or of any rule or regulation of the Licensing Board;
(7) Licensees may not fail to comply with any condition, stipulation or agreement upon which any license was *315 issued or renewed by the Board or upon which any application or petition relating to the premises was granted by the Board. It shall be the duty of the licensee to ensure that all appropriate personnel at the licensed premises are familiar with the rules and regulations of the Board and with any conditions on the license.

 Similarly, G.L.c. 138, §63 and G.L.c. 140, §201, cited by Bayside as support for the Boston Police Department’s ability to require paid details, do no more than allow certain persons to be present during shows taking place on a premise licensed to serve alcoholic beverages. Neither statute gives a police department authority to impose paid police details. For example, G.L.c. 138, §63 states that “[licensing authorities or their agents may at any time enter upon the premises of a person who is licensed by them, and the commission or its agents may enter upon the premises of any holder of a [alcoholic beverage] license to ascertain the manner in which he conducts the business carried on under such license ...” G.L.c. 140, §201 states only that a “police officer may at any time enter . . . the licensed premises of a common viptualer ... for the purpose of enforcing any law ...”

 Moreover, assuming Special Order 94-7 was not superseded by Rule 326, the language in the Special Order giving the Police Department the responsibility to determine the appropriate number of officers that a particular site should have in order to provide an adequate level of safety applies to situations where a paid detail has been requested “or if the activity performed mandates that a paid detail be used.” North American withdrew its request for a paid detail in 1997 when it informed the Boston Police Department that, unless the Police Department agreed in writing by January 15, 1997 to the staffing level requested by North American, “we shall hire no Boston Police for our shows.” Thus, its request did not trigger the Police Department’s responsibility under Special Order 94-7 to determine the appropriate number of officers, and, indeed, the Police Department did not rely on the fact that North American initially had requested a paid detail as support for its authority to require a paid detail at North American’s shows with as many officers as the Police Department deemed necessaiy. Furthermore, there is no support for the proposition that the shows produced by North American constitute performance of an activity “which mandates that a paid detail be used.”

 North American’s alternative argument that the charge imposed is an illegal tax lacks merit. The Supreme Judicial Court in Emerson College v. Boston, 391 Mass. 415, 424-25 (1984), set forth a three-part test to analyze whether a particular surcharge is a fee or a tax. “[F]ees share common traits that distinguish them from taxes: [1] they are charged in exchange for a particular governmental service which benefits the parly paying the fee in a manner ‘not shared by other members of society’. . . ; [2] they are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge, . . . and [3] the charges are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses.” Id. (citations omitted). In this case, North American and Bayside are operating shows and events which apparently necessitate an increase in police protection over and above what would otherwise be provided. Bayside and North American receive a direct benefit from these police details which are not shared by members of the general public. Secondly, the fees imposed are not involuntary even though the police give North American no choice about the desirability of a police detail. The charges are imposed only because Bayside and North American have chooen to operate large scale shows and events open to the public which implicate public safety concerns. “Fees are not taxes ‘even though they must be paid in order that a right may be enjoyed.’ ” Bertone v. Department of Public Utilities, 411 Mass. 536, 549 (1992). Lastly, the amounts collected from the paid details are not used to raise revenue generally, but rather are used to compensate the police officers who actually conduct the detail. See, e.g., American Baseball Club v. Philadelphia, 167 A. 891, 892 (Pa. 1933) (ordinance imposing charges for police and fire protection at athletic contests is valid as a license fee and is not a tax).