Walker, J.
Plaintiff City of Boston (“City”) moves for summary judgment seeking to vacate an arbitration award rendered in defendant’s favor. Defendant Boston Police Patrolmen’s Association (“BPPA”) moves for summary judgment seeking confirmation of the arbitration award. The parties were before the court on October 12, 2003, for oral arguments. For the following reasons, plaintiffs motion is ALLOWED and defendant’s motion is DENIED.
BACKGROUND
The parties’ respective motions address a December 2001 arbitration award finding that the City violated its Collective Bargaining Agreement (“Agreement”) with the BPPA regarding assignment of certain Boston Police Department (“Department”) units to a Boston biotechnical conference in March 2000. The arbitrator ordered the award after conducting hearings in April and June of 2001. Plaintiff filed a petition to vacate the arbitrator’s award in this court on January 11, 2002, pursuant to Mass. Gen. Laws. c. 150C.
In January 2000, Department Commissioner Paul Evans (“Commissioner Evans”)[1] received credible intelligence reports that anarchists and anti-globalization protesters were planning to organize and conduct violent riots surrounding the “Biotech 2000" conference, a national conference on biotechnology that occurred at Boston’s Hynes Convention Center between March 24 and March 30, 2000. The reports forecasted protests similar to those staged during the Word Trade Organization conference in Seattle, Washington, in December 1999. The Seattle protests received international media attention for their violence, public and private property destruction, and clashes with Seattle police, as well as for the enormous protester turnout and the organizational sophistication of the protests.
Commissioner Evans and other Department members met extensively with Seattle Police officials in order to understand the nature of the Seattle protests and create a strategy for controlling the anticipated Boston protests. After those meetings with Seattle officials, Commissioner Evans determined that the Department must create, train and deploy a Special Tactical Force (“Force”) to enforce riot control. The Force would be responsible for conducting operations separate and distinct from those required of Department patrol officers who were also expected to be assigned to conference-related crowd control.
Commissioner Evans created the Force using members of three Department units: the Youth Violence Strike Force (“YVSF”), the Drug Control Unit (“DCU”) and the Mobile Operations Patrol (“MOP”). Commissioner Evans asserted that the members of those units were best equipped for quick implementation of special riot control training as a result of their day-to-day *629 work in team-oriented, centralized police units. The Commissioner also believed that deployment of the Force would allow the Department to respond to the expected riots without disrupting the ordinary Department district operations or depleting the availability of district patrol officers responsible for 911 and emergency response throughout Boston. Commissioner Evans determined that training patrol officers for the Force would be more time-consuming and inefficient than training members of existing team units, and that it was an inappropriate strategy in light of time and other logistical constraints facing the Department.
The Force was deployed as planned during the conference but did not encounter the level of violence and unrest that plagued the Seattle conference. The Force primarily remained at the centralized location or conducted intelligence operations at various locations throughout Boston. Fortunately, the violence and destructiveness of the protests and demonstrations did not match the anticipation of the City and Commissioner Evans.
The BPPA filed a grievance following the conclusion of Biotech 2000, asserting that Commissioner Evans’ use of the Force deprived BPPA members of an opportunity to obtain overtime work under the Agreement. Specifically, the BPPA argued that creation and training of the Force, and its subsequent deployment, violated the “low man” principles of Agreement Articles IX and XII, which required overtime opportunities to be made available on a priority basis to patrolmen who had accrued the least amount of overtime work.[2] The BPPA stated that the City violated the low-man concept by bypassing patrolmen covered by the Agreement and deploying detectives from the YVSF and DCU who were not covered by the Agreement. The City denied the BPPA’s grievance, and the BPPA submitted the grievance to an arbitrator, pursuant to the Agreement.
The arbitrator, Richard Boulanger (“Boulanger”), found that Commissioner Evans violated the Agreement by depriving patrolmen of their bargained-for overtime opportunities. Boulanger found that the concerns about violent protests created a special need for a specialized tactical force, but ruled that Commissioner Evans should have assigned patrolmen to the Force pursuant to the low-man concept. Essentially, Boulanger recognized that the special need provided Commissioner Evans with authority to avoid strict adherence to the overtime provisions when staffing the Force, but found that Commissioner Evans’ selection of particular officers was an improper exercise of that authority.[3]
The City now asks this court to vacate the arbitrator’s decision because it usurped the Commissioner’s statutory authority over personnel deployment. The BPPA asserts that Massachusetts statutory law supports Boulanger’s application of the Agreement over the decision of Commissioner Evans.
DISCUSSION
Summary Judgment Standard
A court should grant summary judgment where the record, including pleadings, depositions, answers to interrogatories, admissions on file and affidavits, shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Lindsay v. Romano, 427 Mass. 771, 773 (1998); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Diamond v. City of Newton, 55 Mass.App.Ct. 372, 373 (2002). The moving party has the burden of demonstrating the absence of a genuine issue as to any material fact and that it is entitled to have questions of law resolved in its favor. Mass.R.Civ.P. 56(c); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991); Ford Motor Co. v. Barrett, 403 Mass, at 242. See also Flesner v. Technical Communications Corp., 410 Mass. 805, 808-09 (1991) (the moving parly can satisfy its burden by demonstrating that the non-moving party has no reasonable expectation of proving an essential element of its case at trial).
There are no genuine issues of material fact in this case; resolution depends solely on issues of law.
Judicial Review of Arbitration Awards
Review of Boulanger’s decision is governed by Mass. Gen. Laws c. 150E, §11, and is limited in scope. School Committee of Waltham v. Waltham Educators Association, 398 Mass. 703, 705 (1986). This court “shall vacate an award if. . . the arbitrators exceeded their powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law...” Mass. Gen. Laws c. 150E, §11(a)(3). However, this court cannot disturb an arbitrator’s interpretation of a collective bargaining agreement, even if it finds errors of law or fact in the arbitrator’s decision, unless it finds that the decision was fraudulently rendered. City of Lynn v. Thompson, 435 Mass. 54, 61 (2000); School Committee of Waltham, 398 Mass, at 705-06; Concerned Minority Educators of Worcester v. School Committee ofWorcester, 392 Mass. 184, 187 (1984).
Statutory Framework of the Commissioner’s Authority[4]
Two statutes regarding a police commissioner’s authority are relevant to this discussion: (1) St. 1962, c. 322; and (2) Mass. Gen. Laws c. 150E, §7(d). St. 1962, c. 322, states that the “police commissioner shall have cognizance and control of the government, administration, disposition and discipline of the department, and of the police force . . .” Id. at §11 (emphasis added). According to the City, that language governs this dispute; thus, because police commissioners are solely responsible for officer deployment, Boulanger exceeded his authority in finding that Com *630 missioner Evans’ deployment of the Force violated the Agreement.
The BPPA argues that the Agreement takes precedence over the Commissioner’s decision under Mass. Gen. Laws c. 150E, §7(d). That statutory provision, as amended by the Legislature through Chapter 9 of the Acts of 1998, mandates that where there is a conflict between matters within the scope of a collective bargaining agreement and “the regulations of a police chief... or of a police commissioner or other head of a police or public safety department of a municipality . . . the terms of the collective bargaining agreement shall prevail.” (Language added by amendment in italics.)[5]
The Arbitrator’s Decision
Boulanger determined that Commissioner Evans violated the overtime provisions of Article IX by bypassing Department patrolmen in favor of members of the YVSF and DCU when staffing the Force. His decision clearly finds that the Agreement applies over the actions of Commissioner Evans. This court cannot disrupt that decision unless Boulanger exceeded his authority in making it. This court finds that Boulanger did exceed his authority.
Massachusetts courts have consistently found that police commissioners are afforded broad managerial authority under St. 1962, c. 322. Boston v. Boston Police Superior Officers Federation, 52 Mass.App.Ct. 296, 299 (2001); Boston v. Boston Police Patrolmen’s Ass’n., 41 Mass.App.Ct. 269, 272 (1996); Boston v. Boston Police Superior Officers Federation, 29 Mass.App.Ct. 907, 908 (1990). An arbitrator, while equipped with broad powers of contract interpretation, cannot inquire about “the exclusive managerial prerogative of the police chief over deployment of police officers on an overtime basis when, in his judgment, the public safety so requires ...” Town of Andover v. Andover Police Patrolmen’s Union, 45 Mass.App.Ct. 167, 168 (1998). Under St. 1962, c. 322, “ ‘the deployment of officer personnel ... is a fundamental and customary prerogative of municipal management’. . . [and a] commissioner’s decisions relating to officer assignments [are] ‘beyond an arbitrator’s authority.’ ” City of Boston v. Boston Police Superior Officers Federation, 52 Mass.App.Ct. at 299 (citations omitted).
Under the circumstances of this case, this court finds that Commissioner Evans properly exercised his managerial authority in the creation, training and deployment of the Force, and Boulanger therefore exceeded his authority in overturning the decision. It is doubtful that c. 150E, §7(d) applies because it states, on its face, that a collective bargaining agreement takes precedence over a police commissioner’s regulations; there are no Commissioner’s regulations at issue in this case. Even assuming that c. 150E, §7(d) generally applies to Commissioner Evans’ actions, Massachusetts case law protects a commissioner’s fundamental managerial authority. Thus, there is no conflict between the Agreement and Commissioner Evans’ actions because his managerial actions are outside the scope of topics that may be included in a collective bargaining agreement. See Mass. Gen. Laws c. 150E, §7(d) (collective bargaining agreements prevail when a commissioner’s regulations conflict with matters “which are within the scope of negotiations pursuant to section six of this chapter,” which covers “wages, hours, standards or productivity and performance, and any other terms and conditions of employment”).
Commissioner Evans was not faced with a simple question of how to distribute overtime shifts for patrolmen. Rather, he was faced with a complex strategy question of how to effectively utilize Department officers to control what could have been a disastrous situation for the City and its residents. Commissioner Evans determined that an effective strategy involved specialized riot control training for officers who were already accustomed to working in centralized team units, for their experience made them best prepared to address the anticipated unruly crowds outside Biotech 2000. The Department was faced with a limited amount of time to incorporate the lessons learned in Seattle, and the best way to prepare in a short time frame was to train officers who were already accustomed to team unit work. Such decisions must be made by a police commissioner in the exercise of his or her managerial authority.
Boulanger’s decision addressed the uniqueness of the concerns regarding Biotech 2000, and stated that there was undoubtedly a special need for specialized forces that obviated Commissioner Evans’ obligation to strictly adhere to the overtime provisions of the Agreement. However, Boulanger found that, despite acknowledging a need for specialized forces, Commissioner Evans was required to use district patrol officers to fill the required Force positions that remained after all available MOP unit members were assigned.
Because the decision to create and train the Force was a personnel deployment issue, Boulanger had no authority to question Evans’ deployment decision. Though Boulanger framed the issue in this case as primarily a dispute over overtime distribution, it is clear that the circumstances before Evans were much more extensive. The overtime issue was secondary to public safety and to policy issues. The Department had a limited amount of time to train a special force for riot control of an event that was far different, and more potentially dangerous, than typical crowd or riot control encountered during routine police work. Commissioner Evans’ primary concern was properly focused on public safety, not the equitable distribution of overtime opportunities for patrolmen.
There would be a tremendous public policy blow to the authority and functions of a police commissioner if his personnel deployment decisions could be undermined by concern for whether patrolmen are receiving *631 equitable overtime opportunities under a collective bargaining agreement. Massachusetts courts have long held that, as a matter of public policy and statutory authority granted by St. 1962, c. 322, police commissioners must be free to make personnel deployment decisions without interference from police unions or arbitrators. There is nothing in the present case history that dictates a different result.
As a matter of law, Boulanger did not have the authority to inquire about the propriety of Commissioner Evans’ personnel deployment decisions, despite the 1998 amendment to Mass. Gen. Laws c. 150E, §7(d). As such, his award ordering compensation to patrolmen for lost training opportunities and lost overtime opportunities must be vacated. The decision of Commissioner Evans must stand unaltered by Boulanger’s award.
ORDER
For the foregoing reasons, defendant’s motion for summary judgment is DENIED. Plaintiffs motion for summary judgment is ALLOWED. It is hereby ORDERED that the arbitration award rendered in defendant’s favor is VACATED.

 Evans is no longer the Department Commissioner.

The low-man concept is meant to ensure that all patrolmen have equal access to overtime opportunities.

Boulanger agreed that initial assignment of the MOP units to the Force, in disregard of the low-man concept, was proper because those units had previously received riot control training, which addressed the special need concerns. However, Boulanger determined that use of officers from the YVSF and DCU, instead of patrolmen, violated the Agreement because the YVSF and DCU officers did not have any more prior riot control training than patrol officers. Thus, because patrol officers and YVSF and DCU members were on equal ground regarding prior riot control training, there was no valid reason to bypass the Agreement’s overtime provisions in favor of YVSP/DCU officers.

In addition to the statutoiy authority conferred on a police commissioner regarding management and deployment of personnel, the Agreement itself contains a provision addressing the commissioner’s management authority. Article V, Management Rights, states that “the City (and its Mayor and Police Commissioner) reserves and retains the regular and customary rights and prerogatives of municipal management.”

Prior to the addition of that language, c. 150E, §7(d) provided that collective bargaining agreements prevailed over the regulations of a police chief, but contained no language addressing the regulations of a commissioner. The 1998 amendment was enacted to address the inequity of the former provision.